Dr. W. B. LANDRY, Bryan Zeringue and
Curtis Chauvin, Plaintiffs-Appellants
Cross-Appellees,

v.

ALL AMERICAN ASSURANCE
COMPANY, Defendant,

REPUBLIC SECURITIES CORP., et al.,
Defendants-Third-Party
Plaintiffs-Appellees,

v.

BANK OF ST. CHARLES & TRUST COM-
PANY, et al., Third-Party Defendants-
Appellees Cross-Appellants.

No. 81–3302.

United States Court of Appeals,
Fifth Circuit.

Oct. 7, 1982.
As Amended on Denial of Rehearings
Nov. 19, 1982.

Robert E. Winn, New Orleans, La., for plaintiffs-appellants cross-appellees.

Bruce S. Kingsdorf, New Orleans, La., for Republic Securities and Charest Thibaut.

Gregory Frost, Baton Rouge, La., for Royal American.

Anita Warner, New Orleans, La., for Bank of St. Charles & Trust Co., et al.

Before GARZA, POLITZ and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

Below, the unsuccessful plaintiffs sought to try their case under several theories of securities law, but were permitted to proceed under only one. On this appeal it is their contention that the district court erred both in its dismissal of the other claims and the jury instructions given. With the exception of one state law issue, we find that no reversible error was committed and affirm the result below.[1]

### I. A Change of Seasons

In the spring of 1974, appellants Bryan Zeringue, Curtis Chauvin and Dr. W. B. Landry learned—later to their detriment—that certain common stock of the St. Charles Bank and Trust Company was to be made available for sale. The circumstances surrounding the sale of that stock gave rise to the present suit. Disagreement between the parties as to the facts is minuscule.

Appellants are two businessmen and a practicing physician who live and work in St. Charles Parish, Louisiana. For years they had banked with the St. Charles Bank and Trust Company [hereinafter referred to as the Bank]. When the Bank formed an "advisory board" in the fall of 1973, appellants Zeringue and Chauvin were asked to serve on it; they accepted. In the spring of 1974, both Zeringue and Chauvin were informed at one of the board's meetings that the Bank's chairman of the board, Charest Thibaut, was thinking of retiring and was willing to sell some of his common stock. Not long thereafter, Dr. Landry was also informed, by one of his patients,[2] that stock in the Bank was to be made available for purchase. That summer, each appellant purchased 1,500 shares of the Bank's common stock at $60 per share for a total of $90,000 apiece, or $270,000 for the total purchase price.

At first, it appeared that the money invested by the appellants was well spent—in January of 1975 a 25% stock dividend was declared, increasing the common stock ownership of each appellant from 1,500 to 1,875 shares. This feeling of euphoria, however, was unfounded. In the fall and winter of 1974, and the spring of 1975, various audits and bank examinations conducted by the Federal Deposit Insurance Corporation and the Louisiana Commissioner of Financial

---

1. Some of the defendants have also chosen to appeal; however, in light of our finding that no error was committed with respect to the court's "due diligence" jury instruction and interrogatory, their claims are now moot.

2. Appellee Henry J. Friloux, Sr., who at that time was serving as a member of the Bank's board of directors.

Institutions revealed gross inadequacies and deficiencies in the financial structure of the Bank. As a result of these examinations and actions taken by regulatory authorities, very substantial changes in the Bank's organization were brought about, including the resignation of the Bank's president, C. Therral Ransome, and the Bank's chairman of the board, Charest Thibaut. Other members of the board also resigned or were asked to resign in the spring and summer of 1975. Finally, in December of 1975, the Bank issued a proxy statement in which its precarious financial condition was set out, and in January, 1976, the Bank issued a stock offering to raise needed additional capital. At that time the Bank's common stock was valued at $4 per share—down from the $60 per share paid by appellants in the summer of 1974.

Outraged by the drastic devaluation of their investments, appellants consulted with counsel, and on January 26, 1977, filed suit in federal court alleging that All American Assurance Company, Republic Securities Corporation, Charest Thibaut, Remy F. Gross and C. Therral Ransome had violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.[3] Specifically, appellants contended that the financial statements prepared and issued by the Bank in 1973 and 1974 were inaccurate and grossly misrepresented its financial condition. Furthermore, it was asserted that representations made by the various defendants at advisory board meetings and elsewhere were affirmatively misleading, inaccurate and omitted material information.[4]

On January 29, 1979, appellants amended their complaint so as to expand both the number of defendants and the causes of action asserted. Added to the list of defendants were the Bank, Royal American Corporation, Henry Friloux and Alcide J. Laurent.[5] The causes of action asserted were broadened to encompass claims under § 17(a) of the Securities Act of 1933, La. Rev.Stat.Ann. § 12:91, and the Louisiana Blue Sky Law (La.Rev.Stat.Ann. § 51:701, et seq.).

Prior to trial, however, the defendants filed motions to dismiss and/or for summary judgment claiming that no private cause of action was created under either § 17(a) of the Securities Act of 1933 or La.Rev. Stat.Ann. § 12:91. The trial court agreed and dismissed the counts. The trial court also granted defendants' motion to dismiss the Louisiana Blue Sky claim and held that the two-year statute of limitations included in the Blue Sky Law[6] was peremptive rather than prescriptive.

Thereafter, the case went to trial. Although the jury found that the Bank, Henry Friloux and Alcide J. Laurent had knowingly or recklessly misrepresented or failed to disclose material facts to the ap-

---

3. As earlier noted, Charest Thibaut was the chairman of the board of the Bank of St. Charles with controlling stock ownership. All American Assurance Company and Republic Securities Corporation were corporations controlled by Thibaut. Both Thibaut and the two corporations were the owners of stock purchased by appellants.

C. Therral Ransome died before the trial, but was the president of the Bank until May of 1975. Remy F. Gross, who settled his suit during the course of the trial, was a member of the Bank's board of directors, its executive committee and its loan committee.

4. Of particular significance was the fact that many of the loans carried as collectible by the Bank were in fact substandard or worse. Appellants also contended that the sale of the Thibaut stock had nothing to do with any intended retirement, and that Thibaut received a very substantial commission on each share of stock sold, the total of which exceeded $400,-

000. None of these facts were disclosed to appellants or other purchasers. Appellants also claimed that the price of the stock had no reasonable relationship to its true market value, but was a manipulated or rigged price which was calculated to mislead and which in fact misled the appellants in their appraisal of the stock.

5. The St. Charles Bank and Trust Company was made a party-defendant because of its active involvement and participation in the sale of its stock. Royal American Corporation was sued because it was a prior owner of some of the stock sold to Charest Thibaut which in turn was sold to the appellants. Friloux and Laurent, like Gross, were members of the Bank's board of directors, executive committee and loan committee.

6. La.Rev.Stat.Ann. § 51:715 E

pellants in connection with their purchases of stock, it also found that the appellants had not exercised "due diligence" in purchasing the stock and were, therefore, precluded from recovery. This appeal ensued.

## II. The Dismissed Theories For Relief

(a) Implied Private Cause of Action Under § 17(a) of the Securities Act of 1933

Unquestionably, the most far reaching of the issues we resolve today is whether § 17(a) of the federal Securities Act of 1933 [7] creates an implied private cause of action.[8] While *res nova* in this Circuit,[9] the controversy over this issue is by no means new.[10] Of the circuits which have expressly addressed the issue, four have ruled that a private cause of action may be implied,[11] while one has ruled that it may not.[12] But while a clear majority view exists, few circuit court decisions have analyzed the issue in depth. In fact, as one learned commentator has observed, the ex-

---

**7.** 15 U.S.C. § 77q(a) (1976).

**8.** The Supreme Court has twice declined to express an opinion as to whether such a private cause of action exists. *See Aaron v. SEC*, 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611, 621 (1980); and *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 1924 n. 6, 44 L.Ed.2d 539, 548 n. 6 (1975).

Note, though, that while the statutory language of § 17(a) does not suggest a private cause of action, subsequent provisions enable equitable and criminal causes of action. 15 U.S.C. § 77t (1976) (injunctions and prosecution of offenses); 15 U.S.C. § 77x (1976) (penalties).

**9.** One commentator has suggested that this Circuit's decision of *Smith v. Jackson Tool & Die, Inc.*, 419 F.2d 152 (5th Cir. 1969), implicitly recognizes an implied cause of action under § 17(a). *See* Note, *Section 17(a) of the Securities Act of 1933: Implication of a Private Right of Action*, 29 UCLA L. Rev. 244, 245 (1981). However, until now, the issue has never been squarely presented to this Court. *See, e.g., John R, Lewis, Inc. v. Newman*, 446 F.2d 800, 803 (5th Cir. 1971). Our late brother, Robert A. Ainsworth, writing for the Court stated: "This Circuit has never squarely determined whether a private civil action for damages lies for violations of Section 17(a)." *Herpich v. Wallace*, 430 F.2d 792, 799 n. 6 (5th Cir. 1970). Of more recent vintage is *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981), *modified on denial of rehearing and of rehearing en banc, cert. granted,* U.S. , 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982), where Judge Alvin B. Rubin speaking for our Court stated: "The plaintiffs alleged violations of Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b 5, 17 C.F.R. § 240.10b 5, all of which have been held to imply a private action," 640 F.2d at 541. We are sure that Judge Rubin did not mean that this Circuit had passed on the question of whether there is an implied private cause of action under Section 17(a) since it was not discussed any further and was not necessary to the result reached in the case before him. The questions on which certiorari was granted in *Huddleston* were: (1) Is the clear and convincing standard the appropriate burden of proof in private rule 10(b)(5) actions? and (2) Does an implied remedy exist under Section 10(b) of the 1934 Act or Section 17(a) of the 1933 Act for purchasers of securities who have an express remedy under Section 11 of the 1933 Act by virtue of the fact that the securities purchased were issued pursuant to a registration statement which complied with the requirements of Section 5 of the 1933 Act? While it would be helpful to have the Supreme Court resolve the split in the Circuits on the question of whether there is an implied private cause of action under Section 17(a), we feel that this issue is not squarely presented in *Huddleston.* So, we must go forward and decide the issue for this Circuit.

**10.** The first case to recognize § 17(a) as the basis for a private cause of action was *Osborne v. Mallory*, 86 F.Supp. 869 (S.D.N.Y.1949), in which the plaintiffs invoked both Rule 10b 5 of the 1934 Act and § 17(a) of the 1933 Act with respect to the same conduct. By then a private damages right and remedy had been recognized by the courts for violations of § 10b of the 1934 Act and Rule 10b 5, and the court in *Osborne* simply applied the rationale of those decisions to § 17(a).

**11.** *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 815 (9th Cir. 1981); *Kirshner v. United States*, 603 F.2d 234, 241 (2nd Cir. 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979), 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir. 1975); and *Surowitz v. Hilton Hotels Corp.*, 342 U.S. 596, 604 (7th Cir. 1965), *rev'd on other grounds*, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

**12.** *Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 789 91 (8th Cir. 1967).

istence of the § 17(a) private remedy "seems to be taken for granted." 6 L. Loss, Securities Regulation 3913 (2nd ed. Supp. 1969).[13]

Most of these cases trace their creation of a private cause of action back to Chief Judge Friendly's concurring opinion in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2nd Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1969). Judge Friendly's opinion was primarily concerned with establishing that negligence in the drafting of a press release should not be the basis of civil liability under Rule 10b–5(2).[14]

In his discussion of the origins of Rule 10b–5, however, Judge Friendly stated in dicta that while he had considerable doubt as to whether a private remedy under § 17(a) was ever intended,[15] "there seemed little practical point in denying the existence of such an action under § 17" "[o]nce it had been established ... that an aggrieved buyer has a private action under § 10(b) of the 1934 Act."[16] As subsequent decisions have revealed, this seed fell on very fertile ground. The lack of a clearly articulated standard, however, has resulted in the fragmentation of the district courts with respect to this issue.[17] Nor can it be said

**13.** For example, the Fourth Circuit's decision of *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir. 1975), is frequently cited as standing for the proposition that a private right of action exists under § 17(a). Yet that case, while so holding, merely glossed over the issue. The opinion contains almost no discussion, and, as authority, cites only *Johns Hopkins University v. Hutton*, 488 F.2d 912 (4th Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974)—a case which merely assumed that a private right existed, with neither discussion nor citation for support.

**14.** Rule 10b–5, promulgated under § 10(b) of the Securities and Exchange Act of 1934, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or by the use of mails, or of any facility of any national securities exchange,
>
> (1) to employ any device, scheme, or artifice to defraud,
>
> (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit of any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240 (1949).

**15.** Judge Friendly observed that

> [T]here is unanimity among the commentators, including some who were in a peculiarly good position to know, that § 17(a)(2) of the 1933 Act—indeed the whole of § 17—was intended only to afford a basis for injunctive relief and, on a proper showing, for criminal liability, and was never believed to supplement the actions for damages provided by §§ 11 and 12. See Landis, Liability Sections

of Securities Act, 18 Am.Acct. 330, 331 (1933); Douglas and Bates, Federal Securities Act of 1933, 43 Yale L.J. 171, 181–82 (1933); 3 Loss, Securities Regulation 1785– 86 (1961).

*SEC. v. Texas Gulf Sulphur Co.*, 401 F.2d at 867.

**16.** *Id.*

**17.** As one commentator succinctly summarized:

> [T]he district courts spawned a myriad of results when responding to the question. The district courts have sometimes refused to follow the lead of their circuits, and several have analyzed the section 17(a) issue with an approach entirely different from that of the circuits.
>
> The district court decisions which imply a private cause of action under section 17(a) fall into three groups. The first group relies on *Osborne v. Mallory* [86 F.Supp. 869 (S.D. N.Y.1949)], implying a cause of action by analogy to rule 10b 5 and section 10(b) of the 1934 Act. These opinions generally consider neither the statutory scheme nor the legislative history of the 1933 Act. Rather, they merely cite *Osborne*, which implied a private right under section 17(a) by referring to early rule 10b–5 cases applying principles of tort law.
>
> The second line of cases reveals a "splintering" phenomenon. The cases imply a private remedy under one or two of the subsections of section 17(a), but not all three subsections. These cases focus on the overlap between section 17(a)(2) and section 12(2). Out of concern that a private cause of action under section 17(a)(2) would obliterate the more restrictive section 12(2) cause of action, the courts imply a private cause of action under one or more subsections of section 17(a), but not under all subsections of section 17(a). In these "splintering" cases the courts

that a general consensus exists among the commentators.[18]

Perhaps the main reason for the somewhat awkward development of the law under § 17(a) of the 1933 Act is the fact that it has traditionally lived in the shadow of another area of securities law: Rule 10b–5.[19] Rule 10b–5, adopted under § 10(b) of the Securities and Exchange Act of 1934,[20] is substantially identical to § 17(a).[21] When the judiciary recognized a private cause of action under Rule 10b–5 shortly after its promulgation,[22] cases that might have fit a § 17(a) cause of action were instead decided under Rule 10b–5. This was true even when a plaintiff pleaded a cause of action under both.

In 1976, however, the Supreme Court severely limited the Rule 10b–5 cause of action in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). There the Court established that

desire to provide a remedy for an injured plaintiff, yet are constrained by the concern that a broad-ranging implied cause of action under section 17(a) might swallow the section 12(2) express remedy. Thus, the courts grant the private cause of action wherever they find no direct conflict with another section of the Act.

A third group of cases holds that a private cause of action exists under section 17(a), but follows neither of the previous rationales. In *Newkirk v. Hayden, Stone & Co.*, [[1964 1966 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91, 621 (S.D.Cal.1965)], the court stated that to imply a private remedy under section 17(a) would deter abuse of discretion in the security area.

Numerous district courts have refused to imply the private cause of action plaintiffs sought. The three leading cases are *Dyer v. Eastern Trust & Banking Co.* [336 F.Supp. 890, 895 97 (D.Me.1971)], *Reid v. Mann* [381 F.Supp. 525 (N.D.Ill.1974)], and *Hill v. Der* [521 F.Supp. 1370 (D.Del.1981)]. The opinions rely extensively on the legislative history of the 1933 Act, as well as commentary by various scholars and participants suggesting that Congress intended no private remedy under section 17(a). These opinions also criticize those cases following *Osborne v. Mallory*, suggesting that the *Osborne* court failed to consider significant differences between the 1933 Act and the 1934 Act. *Reid v. Mann* also points out that none of the earlier cases providing a cause of action under section 17(a) involved claims brought exclusively under section 17(a). Several district courts have cited *Reid v. Mann* or *Dyer v. Eastern Trust & Banking Co.* as authority to deny a private cause of action.

Note, *Section 17(a) of the Securities Act of 1933: Implication of a Private Right of Action, supra* note 10, at 249 52.

**18.** Compare Hazen, *A Look Beyond the Pruning of Rule 10b 5: Implied Remedies and Section 17(a) of the Securities Act of 1933*, 64 Va.L.Rev. 641 (1978); Note, *Implied Civil Remedies Under Section 17(a) of the Securities Act of 1933*, 53 B.U.L.Rev. 70 (1973); Note, *Section 17(a) of the Securities Act of 1933: Implication of a Private Right of Action, supra*, note 10; and Note, *Implied Private Rights of Action Under the Securities Act of 1933 Section 17(a)*, 14 U.Mich.J.L.Ref. 563 (1981) (private cause of action may be implied) *with* 3 L. Loss, Securities Regulation 1784 86 (2nd ed. 1961); Douglas & Bates, *Federal Securities Act of 1933*, 43 Yale L.J. 171, 181–82 (1933); Horton, *Section 17(a) of the 1933 Securities Act—the Wrong Place for a Private Right*, 68 Nw.U.L.Rev. 44 (1973); Landis, *Liability Sections of Securities Act*, 18 Am.Accountant 330, 331 (1933); Ruder, *Civil Liability Under Rule 10b -5: Judicial Revision of Legislative Intent?*, 57 Nw.U.L.Rev. 627, 656-57 (1963); and Note, *Section 17(a) of the '33 Act: Defining the Scope of Antifraud Protection*, 37 Wash. & Lee L.Rev. 859 (1980) (private cause of action may not be implied).

**19.** See note 15 *supra.*

**20.** 15 U.S.C. § 78j(b) (1976).

**21.** The Securities Exchange Act of 1934 was designed to protect investors, including buyers, sellers and the general public, and "to insure the maintenance of fair and honest markets" in securities transactions. 15 U.S.C. § 78b (1976). Section 10(b) makes it unlawful to employ "any manipulative or deceptive device or contrivance" in connection with the purchase and sale of securities in contravention of such rules as the SEC may prescribe. The SEC promulgated Rule 10b–5 to implement § 10(b). The announced purpose for this Rule was to correct an oversight in securities regulation; fraud by brokers and dealers in the purchase and sale of securities had been regulated, but no provision prohibited fraud by individuals and corporations in the purchase of securities. *See* SEC Securities Exchange Release No. 3230 (May 21, 1942). Consequentially, Rule 10b 5 adopted the language of § 17(a) of the 1933 Act with the changes necessary to extend coverage to purchasers and to cover activities on exchange facilities.

**22.** *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946).

allegations of the defendant's scienter are an essential element of the plaintiff's cause of action under Rule 10b–5. The Court based its holding on the language of § 10(b) of the 1934 Act, asserting that the narrower language of that section constrained the reach of the broader Rule 10b–5 language.[23]

The law under § 17(a), however, is not so distinct. In *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Supreme Court was faced with the question of whether the SEC was required to establish scienter as an element of a civil enforcement action[24] to enjoin violations of § 10(b) and Rule 10b–5 of the 1934 Act, and § 17(a) of the 1933 Act. While the Court decided that scienter was a necessary prerequisite under the 1934 Act, its response split with respect to § 17(a):

> The language of § 17(a) strongly suggests that Congress contemplated a scienter requirement under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3). The language of § 17(a)(1), which makes it unlawful "to employ any device, scheme, or artifice to defraud," plainly evinces an intent on the part of Congress to proscribe only knowing or intentional misconduct....
>
> By contrast, the language of § 17(a)(2), which prohibits any person from obtaining money or property "by means of any untrue statement of a material fact," is devoid of any suggestion whatsoever of a scienter requirement....

Finally, the language of § 17(a)(3), under which it is unlawful for any person "to engage in any transaction, practice, or course of business which *operates or would operate* as a fraud or deceit," (emphasis added) quite plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible....

It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3).

446 U.S. at 695–97. True, the court resolved the issue only with respect to SEC enforcement actions; however, it is doubtful that a different interpretation would be given if an implied private cause of action is found to exist. Given this assumption, § 17(a) suddenly becomes an attractive, viable alternative to actions previously brought under Rule 10b–5, at least as to those based upon negligence. All of this, however, takes for granted that a private cause of action does indeed exist under § 17(a). After analyzing the issue in light of recent Supreme Court decisions, we conclude that it does not.

■ The question of whether a private cause of action should be implied under § 17(a) operates against a backdrop of long-developing and varied judicial formulations of the circumstances under which implication is appropriate.[25] The most recent test

**23.** *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201 06, 96 S.Ct. 1375, 1384 87, 47 L.Ed.2d 668, 681 84 (1976).

**24.** *See* note 9 *supra*.

**25.** *See generally*, Steinberg, *Implied Private Rights of Action Under Federal Law*, 55 Notre Dame Law. 33 (1979); Note, *An Analytical Framework for Implied Causes of Action: Section 17 of the Securities Exchange Act* and Redington v. Touche Ross & Co., 59 B.U.L.Rev. 157, 162 72 (1979); and Comment, *Implied Rights of Action in Federal Legislation: Harmonization Within the Statutory Scheme*, 1980 Duke L.J. 928 (1980).

A private cause of action was first implied by the Supreme Court in *Texas & Pacific Railway Co. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916), in response to congressional failure to provide an express statutory remedy. In that decision, the court stated that

> A disregard of the command of the statute is a wrongful act, and where it results in damage to one of the class for whose especial benefit the statute was enacted, the right to recover the damages from the party in default is implied, according to a doctrine of the common law expressed in 1 Comyn's Dig. title, "Action upon Statute" (F), in these words: "So, in every case, where a statute enacts or prohibits a thing for the benefit of a person, he shall have a remedy upon the same statute for the thing enacted for his advantage, or for the recompense of a wrong done to him contrary to the said law." (*Per* Holt, Ch.J., Anonymous, 6 Mod. 26, 27.) This is but an application of the maxim, *Ubi jus ibi remedium*.

241 U.S. 39 40, 36 S.Ct. 484.

stems from the Supreme Court's decision of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cort*, the Supreme Court unanimously refused to imply a private cause of action for damages against corporate directors and in favor of stockholders for purported violations of a criminal statute prohibiting corporations from making certain campaign contributions. In rejecting the plaintiff's theory that implication was appropriate for violations of this criminal statute, Justice Brennan outlined the following four-part test for determining when a private remedy should be implied:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

(citations omitted). 422 U.S. at 78, 95 S.Ct. at 2088. Combined, these four factors present the relevant inquiries to pursue in resolving the question of whether an implied cause of action exists.

The test set down in *Cort* was more restrictive than any of its predecessors.[26] Notwithstanding this, more recent cases, by their music if not their lyrics, evince a further retreat from the creation of implied causes of action. For example, in *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568–74, 99 S.Ct. 2479, 2485–88, 61 L.Ed.2d 82, 91–94 (1979), the court observed that examination of the language, legislative history and purpose of a statute are the proper means for resolving the implication issue. Since the first three criteria of the *Cort* standard are the traditional indicia of legislative intent, the *Redington* Court placed special emphasis on these factors. If these three inquiries remain unsatisfied, the *Redington* court held that courts need not determine whether an implied private right is a cause of action traditionally relegated to state law. In denying private rights under § 17(a) of the 1934 Act, the court indicated for the first time that the four elements of the *Cort* test are not of equal weight;[27] the ultimate issue is whether Congress intended to create a private cause of action. *Id.* at 575–77, 99 S.Ct. at 2488–89. *See also California v. Sierra Club*, 451 U.S. 287, 293, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101, 107 (1981).

This approach was echoed later that year in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), where the court premised its analysis of the implication issues upon basic statutory construction. There, the court declined to imply a private remedy under § 206 of the Investment Advisers Act of 1940,[28] relying primarily on its understanding of the Act's legislative history. It noted that other sections of the Act provided for criminal penalties, civil action by the SEC, and other administrative sanctions

It was not until *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), however, that the Supreme Court finally established a standard test for implication. Before a private cause of action would be implied, it first had to be determined both that the "chief purpose" of the statute was to protect the plaintiff and that an implied remedy was necessary to the effectuation of congressional goals. *Id.* at 432–33, 81 S.Ct. at 1559–60. The *Borak* test—the high water mark for implied causes of action—was liberally applied until the mid-1970's, when the Supreme Court began adopting a more restrictive attitude. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82, 97 (1979); and

Ratner, *The Demise of the Implied Private Right of Action in the Supreme Court*, 11 Inst. Sec.Reg. 289 (1980).

**26.** *E.g., J. I. Case Co. v. Borak*, 377 U.S. 426, 432–33, 84 S.Ct. 1555, 1559·60, 12 L.Ed.2d 423, 427–28 (1964).

**27.** The fact that the elements might not be weighed equally was, however, alluded to in an earlier decision. *Cannon v. University of Chicago*, 441 U.S. 677, 709, 99 S.Ct. 1946, 1964, 60 L.Ed.2d 560, 582 (1979).

**28.** 15 U.S.C. § 80b–6 (1976).

and expressed doubt that Congress merely forgot to mention a private action it meant to confer.[29] Thereafter, the court concluded that if neither the statutory language nor the legislative history revealed congressional intent to imply a private cause of action, the inquiry ends with a denial of private rights.[30]

■ Application of the modified *Cort* test to § 17(a) of the 1933 Act leads this Court to believe that a private cause of action is not implied. As expressed by so many opinions before us,[31] our analysis must begin with the language of the statute itself. Section 17(a) provides that

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (1976). On its face, § 17(a) does not appear to satisfy the first factor of the *Cort* test, for the statutory language does not suggest a private cause of action. The statute merely represents a general censure of fraudulent practices;[32] only subsequent provisions enable equitable and criminal causes of action.[33]

Nor can there be said to be any indication of legislative intent, explicit or implicit, to create such a remedy. The legislative history of the 1933 Act makes no mention of civil liability under § 17(a); congressional discussion of civil liability under the Act centers on §§ 11 and 12.[34] As one commentator has noted:

The most reasonable view regarding Section 17(a) of the 1933 Act is that Congress intended that the *Commission* would use it to deal with flagrant cases of abuse. Evidence of this point of view appears in connection with an amendment offered by Senator Fletcher to Title II of the 1934 Act, which was an amendment to the 1933 Act. Senator Fletcher asked that section 17(a) be amended to require that groups purporting to act on behalf of stockholders comply with certain registration provisions. Section 17(a) was to be amended by adding subsections (c), (d) and (e) and renumbering section 17(c) as section 17(f). Senator Fletcher then asked to have a memorandum explaining the amendment printed

---

**29.** *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20–21, 100 S.Ct. 242, 247–48, 62 L.Ed.2d 146, 155 (1979). *Inclusio unius est exclusio alterius* (The inclusion of one is the exclusion of another).

**30.** *Id.* at 23–24, 100 S.Ct. at 249.

**31.** *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101, 107 08 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146, 152 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82, 91 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560, 571 (1979); *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480, 491 (1977); *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 24, 97 S.Ct. 926, 940, 51 L.Ed.2d 124, 142, (1977); and *Ernst & Ernst v. Hochfelder,* 425

U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, 679 (1976).

**32.** *United States v. Naftalin,* 441 U.S. 768, 772–77, 99 S.Ct. 2077, 2081 83, 60 L.Ed.2d 624, 628 -32 (1979). Conceivably, an argument could be made that § 17(a)(3) identifies "purchasers" as a special class for which the statute was enacted to protect. However, the text of subsection (3) simply describes the object of fraudulent conduct without providing for civil liability.

**33.** *See* note 9 *supra.*

**34.** H.R. Rep. No. 85, 73d Cong., 1st Sess. 9–10 (1933) ("Sections 11 and 12 create and define the civil liabilities imposed by the Act and the machinery for their enforcement which renders them practically valuable.")

in the *Congressional Record.* At the end of the memorandum the following statement appears: "It is to be noted that enforcement of the provisions of the new subsection is left to injunction, stop order, and criminal prosecution. *No civil liability attaches for any violation thereof.*"

It is significant that this memorandum was offered by the Senator whose name was commonly associated with the 1934 Act. He was obviously well acquainted with the provisions of the 1934 Act and the 1933 Act. It seems clear that in Senator Fletcher's opinion no civil liability attached under Section 17 of the 1933 Act.

Ruder, *Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent?, supra* note 19, at 656–57. It would, therefore, appear that the second *Cort* factor has been answered in the negative.

Under *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 23–24, 100 S.Ct. at 249, our analysis could stop here. However, an examination of the remaining *Cort* factors reinforces our result. The third *Cort* factor asks whether "it is consistent with the underlying purposes of the legislative

scheme to imply such a remedy for the plaintiffs?" *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2088. A review of the Act indicates that the answer to this question is also no.

The Securities Act of 1933 contains two express civil liabilities for the protection of purchasers. The first of these is § 11 which prohibits falsehoods and omissions in the registration statement.[35] The second is § 12(2) which protects purchasers from misstatements or omissions in written or oral communications.[36] Together these sections confer specific private rights upon purchasers. Before a purchaser may successfully bring suit under either of these two sections, however, strict procedural requirements must first be satisfied.[37] Section 17(a)(2) prohibits the same type of conduct as §§ 11 and 12, but has none of the limitations imposed by Congress. The creation of an implied cause of action § 17(a) under these circumstances would effectively frustrate the carefully laid framework of the Act.[38]

Finally, *Cort* rejects implication of a private cause of action for matters traditionally relegated to state courts. 422 U.S. at 78,

---

**35.** 15 U.S.C. § 77k (1976).

**36.** 15 U.S.C. § 77*l*(2) (1976).

**37.** For example, §§ 11 and 12 are subject to the statute of limitations contained in § 13; actions must commence within one year from the date of discovery of the misleading nature of a statement or after the discovery should have been made by the exercise of reasonable minds. 15 U.S.C. § 77m (1976). A court may also assess court costs and attorneys' fees against either party. 15 U.S.C. § 17k(e) (1976).

**38.** *See* 3 L. Loss, Securities Regulation, *supra* note 19, at 1785.
This brings us to an apparent inconsistency in two recent Supreme Court decisions. In *Touche Ross & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82, 93 (1979), the court noted that when a statute is surrounded by other sections of the same Act which expressly provide private remedies, the inference arises that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." Yet, earlier that term in *Cannon v. University of Chicago,* 441 U.S. 677, 711, 99 S.Ct. 1946, 1965, 60 L.Ed.2d 560, 584 (1979), the court commented that "[t]he fact that other provisions of

a complex statutory scheme create express remedies has not been accepted as a sufficient reason for refusing to imply an otherwise appropriate remedy in a separate section."
Seemingly, the cases are in conflict; however, the conflict is not irreconcilable.
As *Redington* implicitly recognizes, it is one thing to create a negative inference for implication solely because other sections of the Act contain express remedies and quite another when the express remedies are directed at the same type of conduct, are intended to benefit the same identifiable class, and are passed contemporaneously with the statute in question. As to the former, no negative inference should be drawn. To do so would create the presumption that the implication of private rights of action are disfavored in all circumstances. Without clear guidance from Congress, such an interpretation would be erroneous. There can be little question that in appropriate circumstances Congress is aware of and is supportive of future judicial implication of private remedies. To deny a private right of action in this situation would not only undermine Congress' intent but would also inflict needless injustices upon aggrieved parties. As to the latter, however, a negative inference can properly

95 S.Ct. at 2087. Liability for the sorts of transactions arising under § 17(a), however, is not such a matter. The congressional hearings regarding enactment of the Securities Act are replete with testimony regarding the states' inability to deal with securities fraud.[39] In addition, the Securities Act confers concurrent jurisdiction upon federal and state courts,[40] providing strong support for the proposition that § 17(a) matters are not solely within the state sphere.

Summarizing, then, it would appear that the *Cort* test as applied to § 17(a) of the Securities Act of 1933 points away from the implication of a private cause of action. This, together with the Supreme Court's conservative interpretation of the test in recent years, leads us to the conclusion that the district court correctly dismissed this theory of relief.

### (b) Implied Private Cause of Action Under La.Rev.Stat.Ann. § 12:91

■ Appellants are equally unsuccessful in their attempt to have this Court imply a private cause of action under state law. In Count III of their amended complaint, appellants claimed that certain defendants, in their capacities as officers and/or directors, mismanaged the Bank, thereby causing a decline in the market value of its stock. Recovery was based upon the allegation that such conduct violated the provisions of La.Rev.Stat.Ann. § 12:91, which states that:

> Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that

diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions. Nothing herein contained shall derogate from any indemnification authorized by R.S. 12:83.

The district court, however, dismissed this count on the ground that a private cause of action is not available under § 12:91. We agree.

"The general rule is . . . well established that an action to redress injuries to a corporation . . . cannot be maintained by a stockholder in his own name but must be brought in the name of the corporation, since the cause of action being in the corporation, the stockholder's rights are merely derivative and can be asserted only through the corporation." *Schaffer v. Universal Rundle Corporation*, 397 F.2d 893, 896 (5th Cir. 1968). *See also Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. 1981); and *Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981). Appellants contend that this rule should not apply to them because of a 1968 amendment to § 12:91 which added the phrase "and its shareholders." Appellants assert that the incorporation of this language implicitly grants them a cause of action against the defendants for breach of their fiduciary duties. This exact argument, however, was recently rejected by the Louisiana courts. *Beyer v. F & R Oilfield Contractors, Inc.*, 407 So.2d 15 (La.App.3d Cir. 1981), *writ denied*, 411 So.2d 451 (La. 1982). Their analysis of the statute is equally applicable here:

> Although this statute extends the officers' and directors' fiduciary relationship to the shareholders, it does not extend a direct right of action by the shareholders

be drawn. In this instance, Congress expressly focused on the conduct in question and the class to be afforded recompense. Before drawing such an inference, however, courts should assure themselves that the focus of the statute providing the express remedy is directed at the same type of conduct and is intended to benefit the same identifiable class as the statute which the plaintiff seeks to invoke. If the answer to the foregoing is in the affirmative, then for the courts to impliedly expand the scope of this express remedy may well represent judicial legislation in the face of clear congressional intent.

Steinberg, *Implied Private Rights of Action Under Federal Law, supra* note 26, at 47–48. Applying this rationale to the case at hand, the inference once again is against the creation of an implied private cause of action.

**39.** *See, e.g., Federal Securities Act: Hearings on H. R. 4314 before House Comm. on Interstate and Foreign Commerce*, 73d Cong., 1st Sess. (1933).

**40.** 15 U.S.C. § 77v(a) (1976).

against the officers and directors. The comments under LSA–R.S. 12:91 explain that an action to recover from an officer or director for such a breach of a fiduciary duty is secondary and must be asserted through a shareholder's derivative suit:

"Committee Comment—1968

The fiduciary relationship has been expressly extended to shareholders. The second sentence of this Section is new. Articles 591–611 of the Code of Civil Procedure contain procedural provisions applicable to shareholders' secondary actions, which are also subject to the provisions of R.S. 13:3201–3207."

Articles 591–611 of the Code of Civil Procedure deal solely with class and secondary actions. Counsel for the plaintiff cites no authority which allows the plaintiffs to recover directly from the officers and directors of a corporation for losses sustained by the corporation due to the officers' and directors' mismanagement or fraud.

We hold that the plaintiffs' sole remedy is through a shareholder's derivative suit.

*Id.* at 17.

(c) La.Rev.Stat.Ann. § 51:715 E—Peremptive or Prescriptive?

A more difficult interpretation of Louisiana state law lies before us with respect to

appellants' Blue Sky law claim. In Count II of their amended complaint, appellants asserted that defendants' conduct in connection with the sale of the stock violated Louisiana Blue Sky law[41] and demanded relief pursuant to La.Rev.Stat.Ann. § 51:715. Section 51:715 is the section which provides for the imposition of civil liability. It also provides, however, that "[n]o person may sue under this section more than two years after the contract of sale."[42] Defendants were able to successfully argue below that because the amended complaint was filed more than two years after the sale of the stock,[43] appellants were precluded from recovery. Appellants claim that the district court's dismissal of this cause of action was erroneous. Their contention is that § 51:715 E is subject to the rules of prescription (which admits suspension or interruption of the period of limitation) rather than peremption (which does not). After much consideration, we are inclined to agree.

Were there Louisiana case law on point, the matter could be easily disposed of. However, since the incorporation of the statute of limitations into the section in 1969, the issue has remained unaddressed.[44] The language of the statute does not appear to suggest tolling until the plaintiff discovers or should have discovered the

---

**41.** La.Rev.Stat.Ann. § 51:701, et seq.

**42.** La.Rev.Stat.Ann. § 51:715 E.

**43.** The stock was sold in the summer of 1974; the amended complaint, however, was not filed until January of 1977.

**44.** Since 1969, § 51:715 E has been cited in only three cases. *Dupuy v. Dupuy*, 551 F.2d 1005, 1023–24 n.31 (5th Cir. 1977), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *B. Rosenberg & Sons, Inc. v. St. James Sugar Cooperative, Inc.*, 447 F.Supp. 1, 4–5 (E.D.La.1977), *aff'd*, 565 F.2d 1213 (5th Cir. 1977); and *Stein v. Bradford & Co.*, 360 So.2d 607, 608 (La.App. 4th Cir. 1978). While all three cases use the word "prescriptive" in connection with § 51:715 E, none were squarely faced with the issue. The *Rosenberg* decision, however, merits further attention. In

*Rosenberg*, a seller of stock in a sugar cooperative sought relief under certain provisions of both the Securities Act of 1933 and the Securities and Exchange Act of 1934, including Rule 10b–5. Since there is no federal statute of limitations applying to the 1934 Act, the *Rosenberg* court looked to state law. *See Hudak v. Economic Research Analysts, Inc.*, 499 F.2d 996 (5th Cir. 1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975). The court determined that the applicable limitations period was the two-year period provided by § 51:715 E, which finding was approved by this court in *Dupuy v. Dupuy*, 551 F.2d at 1023–24 n.31. The court also determined that the two-year period only began to run from the date the plaintiff discovered or should have discovered the misrepresentation or omission of a material fact, relying upon the federal "tolling doctrine" made applicable to actions brought under Rule

fraud,[45] yet neither did its predecessor[46] which did permit suspension.[47] Nor is there any recorded legislative history from which we might surmise the intent of the Louisiana legislature. Notwithstanding the paucity of information available with respect to § 51:715 E, we are not reduced to the level of spinning gold out of straw; there is case law in which the Louisiana courts considered the peremption-prescription question with regards to some other statutes.

Since the turn of the century, Louisiana jurisprudence has indicated that the test for determining whether a period for instituting an action is peremptive or prescriptive, is whether the statute creating the right also stipulates the time in which it must be exercised. "When a statute creates a right of action and stipulates the delay within which that right is to be executed, the delay thus fixed is not, properly speaking, one of prescription, but it is one of peremption." *Guillory v. Avoyelles Railway Co.,* 104 La. 11, 15, 28 So. 899, 901 (La.1900). This interpretation is normally considered a matter of judicial deference to the draftsmanship of the statute. Nevertheless, it is only a rule of thumb—one that is not always conclusive.[48] Moreover, it is a rule of interpretation which has been questioned in recent years by the Louisiana courts.

In *Guidry v. Theriot,* 377 So.2d 319, 325 (La.1979), the Louisiana Supreme Court capsulized the more recent trend by referring to its recent case of *Pounds v. Schori,* 377 So.2d 1195 (La.1979):

> In *Pounds v. Schori* . . . we addressed the question thus presented and concluded that specification of the time limit for bringing an action in the same statute that created the right of action, is not the sole test of peremption as distinguished from prescription. In *Pounds,* . . . we held that peremption, as differentiated from prescription, is a matter to be determined by legislative intent revealed by the statute in its entirety, including the purpose sought to be achieved.
>
> We additionally noted in *Pounds* . . . that public policy may also influence the determination of whether a statute is intended to be peremptive rather than prescriptive.

The importance of *Pounds* lies in the court's willingness to analyze the legislative policy underlying the statute, rather than relying upon the *Guillory* rationale. Indeed, "each case of this nature should be considered separately on its merits." 377 So.2d at 1199.

Turning, then, to the statute itself, we note that civil liability may be imposed upon "[a]ny person who . . . [o]ffers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to

10b-5. However, while a federal court faced with a limitations issue in a Rule 10b–5 case borrows the limitations period provided by the state law most closely resembling Rule 10b–5, the application of state law ends at that point. Interruption or suspension of the limitations period is a matter of federal law. The *Rosenberg* decision is no more authority for resolution of the issue currently facing us than is any other case involving an application of the federal tolling doctrine in Rule 10b 5 cases.

**45.** *Compare with Interlox Punch & Die Corp. v. Insilco Corp.,* 174 N.J.Super. 175, 415 A.2d 1208 (1980).

**46.** La.Civ.Code Ann. art. 3536, the general statute of limitations for fraud, provides a one-year period of limitation. La.Civ.Code Ann. art. 3537 states that "[t]he prescription mentioned in the preceding article [3536] runs . . . from that on which the . . . damage was *sustained.*" (emphasis added).

**47.** *See Johnson v. Mansfield Hardwood Lumber Co.,* 159 F.Supp. 104, 127 n. 13 (W.D.La. 1958), aff'd, 263 F.2d 748 (5th Cir. 1959), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959); and *Reardon v. Dickinson,* 156 La. 556, 562, 100 So. 715, 717–18 (1924).

**48.** As one commentator has noted:

> This interpretation is not without merit, but it discounts the possibility that the legislature may have been uncertain which prescriptive period would attach to the action and so designated the period out of caution. Or, the legislature may have desired that the period of action be shorter [or longer] than the prescriptions afforded in the Civil Code and thus stipulated expressly the shorter [or longer] time.

Comment, *Legal Rights and the Passage of Time,* 41 La.L.Rev. 220, 233 (1980).

make the statements made, in the light of the circumstances under which they are made, not misleading ..." La.Rev.Stat. Ann. § 51:715 A(3). Its underlying purpose, therefore, is the promotion of full and accurate disclosure of information in connection with the sale of stock. *See Dupuy v. Dupuy*, 551 F.2d 1005, 1024 n.31 (5th Cir. 1977), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). A finding that the period of limitations contained in § 51:715 E is peremptive would only serve to reward those who most skillfully cloaked their misrepresentations and omissions. This we decline to do.

### III. The "Due Diligence" Jury Instruction and Interrogatory

As explained earlier, appellants were permitted to seek recovery under § 10(b) of the Securities and Exchange Act of 1934, and Rule 10b–5 promulgated thereunder. With regards to this theory, the jury found that certain defendants had engaged in conduct which violated these provisions. The jury also found, however, that the appellants had failed to exercise "due diligence" in the purchase of the stock, and were, therefore, precluded from recovery.[49]

It is appellants' position that the trial court erred in instructing the jury concerning the issue of due diligence. They claim that the court failed to instruct the jury that in order for the appellants to have failed to exercise due diligence, the appellants must have acted recklessly in deciding to purchase the stock. Put another way, they claim that the trial court failed to clarify that the mere fact that a plaintiff in a Rule 10b–5 action acted unreasonably or negligently in the purchase of stock does not preclude him from recovery. Appel-

lants also submit that this inaccuracy was further exacerbated by the interrogatory which asked the jury, without additional explanation, whether due diligence had in fact been exercised in the stock purchase.

■ The appropriate starting point for issues of this type is the language of the instruction itself. With respect to due diligence, the court instructed the jury that

By way of defense, defendants contend that plaintiffs did not exercise due diligence regarding the purchase of stock in the Bank of St. Charles & Trust Company. For, even if you should find that any of the defendants violated Rule 10b–5, the plaintiffs are not entitled to recover unless you also find that the plaintiffs exercised due diligence in the transaction.

In this regard, you must determine whether or not the plaintiffs intentionally refused to investigate in disregard of a risk known to them or so obvious that they must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

Therefore, if you, the jury, find that the plaintiffs did not intentionally refuse to investigate, as stated above, you must conclude that they exercised due diligence in the purchase of the stock. However, if you find that the plaintiffs did intentionally refuse to so investigate, there can be no recovery.

The burden of proof is upon the plaintiffs to prove, by a preponderance of the evidence, that they exercised due diligence in the purchase of the Bank's stock.

Record, vol. 8, at 19–20. Rather than define due diligence as "recklessly refused to investigate"—the minimum standard of conduct in this Circuit to bar recovery[50] —the trial court defined it as "intentionally

---

**49.** The leading case in this Circuit with respect to the defense of "due diligence" is *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir. 1977), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

By considering independently whether the carelessness of a plaintiff should preclude his recovery, the Court promotes two policies. First, general principles of equity suggest that only those who have pursued their own interests with care and good faith should

qualify for the judicially created private 10b–5 remedies. Second, by requiring plaintiffs to invest carefully, the Court promotes the anti-fraud provisions of the Acts and engenders stability in the markets.

*Id.* at 1014 (citations omitted).

**50.** As this Court recently noted in *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1122 (5th Cir. 1980):

[refused] to investigate." It is difficult to understand appellants' quarrel with this charge in that the standard expressed was both stricter and more favorable to their position than was required by law. If error was committed, it inured to their benefit.

The claim that the interrogatory propounded on the subject of due diligence was misleading and defective is also groundless. The interrogatory in question was no more brief or misleading than any other, and the term "due diligence," as shown above, was sufficiently defined in the jury charges to prevent confusion.

AFFIRMED IN PART AND REVERSED IN PART; REMANDED to the court below to decide whether or not he will decide the state law claim or relegate the parties to the state courts of Louisiana.

In *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977), this court delineated the nature of the showing that must be made by a plaintiff asserting a Rule 10b-5 claim to establish that he justifiably relied upon the fraudulent activities of the defendant. This showing is a precondition to recovery and is frequently characterized as a requirement that the plaintiff show he acted with due diligence. *See also Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5th Cir. 1970), *cert. denied*, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971). Noting that "scienter"

must be shown before liability will be imposed upon a defendant charged with violating Rule 10b-5, the court in *Dupuy* held that the standard of care imposed upon a 10b-5 plaintiff by the due diligence requirement should not be more exacting than the corresponding standard imposed upon the defendant. Thus the court concluded that the plaintiff should not be barred from recovering under Rule 10b-5 where he merely acts negligently. Rather, *at a minimum, he must have acted recklessly to have acted without due diligence. Dupuy v. Dupuy*, 551 F.2d at 1020. (emphasis added).