**In re FORTUNE SYSTEMS SECURITIES LITIGATION.**

No. C–83–3348A WHO.

United States District Court,
N.D. California.

Sept. 17, 1984.

David B. Gold, John W. Allured, San Francisco, Cal., for plaintiffs.

Stephen Kapustin, Philadelphia, Pa., for C.E. Pappas, M.D.

Melvin R. Goldman, Janet M. Cooper, Paul R. Dieseth, Morrison & Foerster, Bruce G. Vanyo, Philip R. Rotner, Douglas Y. Peters, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for defendants.

## OPINION

ORRICK, District Judge.

This Court, heretofore having had the benefit of excellent, extensive oral argument, granted defendants' motions for dismissal of two counts of the complaint, alleging violations of §§ 17(a), 15 U.S.C. § 77q(a), and 12(2), 15 U.S.C. § 77*l*, of the Securities Act of 1933 (the "1933 Act").[1] Because questions involving the interpretation of those two sections occur frequently and because the decision of the district courts, courts of appeal, and Supreme Court are in apparent conflict, the Court deems it of importance in this case to state its reasons for its rulings in more detail than it did in open court following oral argument.

## I

Plaintiffs[2] alleged in their second amended consolidated complaint that defendants committed numerous violations of federal and state securities laws in connection with the initial public offering of Fortune Systems Corporation's common stock on March 3, 1983. The seven-count complaint included claims under §§ 11 and 12(2) of the 1933 Securities Act (Counts I and II, respectively); § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 (Count III); California Corporations Code §§ 25400 and 25401 (Counts IV and V, respectively), common law fraud and deceit (Count VI); and negligent misrepresentation (Count VII). The first amended consolidated complaint contained a count based on § 17(a) of the 1933 Act as well.

The disputes raised in this litigation stem from Fortune Systems' initial public offering of five million shares of common stock. The stock was sold pursuant to a Registration Statement filed with the SEC, effective March 4, 1983. Plaintiffs allege that the Registration Statement and Prospectus contained untrue statements of material fact and omitted material facts necessary to make other statements not misleading.

Shortly after going public, Fortune Systems disclosed decreased product orders, delivery delays, and a significant loss for the quarter ending June 30, 1983, resulting in a sharp decline in the price of the stock.

The complaint names numerous individuals and entities as defendants, who can be described under the following categories: (1) the Corporation,[3] its officers and di-

1. In response to the first amended consolidated complaint defendants filed various motions to dismiss. On December 15, 1983, the Court denied the motion to dismiss the §§ 10(b) and 11 claims; it granted the motion to dismiss the § 17(a) claim, and the § 12(2) count was dismissed with leave to amend. Plaintiffs then filed the second amended consolidated complaint on January 19, 1984, attempting to replead the § 12(2) and California Corporations Code causes of action. Oral argument was held on the defendants' renewed motion to dismiss, and the Court dismissed the § 12(2) and Califor-

nia Corporations Code claims with prejudice on March 26, 1984. *See* R.T. March 26, 1984.

2. Plaintiffs are a class of purchasers of Fortune Systems common stock, "who purchased or otherwise acquired [that stock] from March 4, 1983 through June 3, 1983, inclusive." The class was conditionally certified on March 26, 1984; *see id.*

3. Fortune Systems Corporation is a Delaware corporation that designs, develops, manufactures, and markets desk top computers and related software packages.

rectors (including defendants Friedman, Bachar, Henson, McCafferty, Pennington, Schreiber, Toutain, Thomas, Dunn and Van Den Berg); (2) the selling shareholders (including defendants Thomson Communications, Inc., First Capital Corporation, Brentwood Associates II and III (affiliated venture capital limited partnerships), and Greyhound Computer Corporation); and underwriters [4] (including co-lead underwriters, First Boston Corporation, and Alex. Brown & Sons and Montgomery Securities, both investment partnerships).

Defendants' dismissal motions raised two particularly important issues, namely, whether § 17(a) of the 1933 Act carries with it an implied private damages remedy, and whether the complaint's allegations of the defendants' status as "sellers" are sufficient to state a cause of action under § 12(2). The Court deals with these matters below.

## II

The Ninth Circuit has not had before it a case squarely raising the question of the availability of a private cause of action under § 17(a) of the 1933 Act. *See Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 815 (9th Cir.1981). In *Stephenson* the parties and the district court proceeded under the assumption that such a cause of action did exist, and the issue was not raised on appeal. Nonetheless, the circuit considered, in passing, the remedies available for violation of the section. Without analysis, the court agreed with Judge Friendly's concurrence in *SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 867 (2d Cir. 1968), and found:

"In light of the minimal differences between § 17(a) of the 1933 Act and § 10(b) of the 1934 Act, we think the reasoning of the Second Circuit is persuasive and find that a private right of action exists under § 17(a)."

*Id.* at 815.

Perhaps because the parties had not themselves considered the issue, the *Stephenson* court failed to apply the Supreme Court-mandated analysis for deciding whether a private cause of action may be implied by a statute that does not explicitly provide such a right. *See generally Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Further, the *Stephenson* court did not recognize that *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), severely undercuts, if it does not altogether destroy, the assumptions explicitly made by Judge Friendly in *Texas Gulf Sulphur.* These obvious gaps in *Stephenson* compel this Court to consider the availability of a private action for damages under § 17(a) of the 1933 Act.[5]

## A

Section 17(a) of the 1933 Act declares it unlawful for any person in the offer or sale of a security (1) to employ a device, scheme or artifice to defraud; (2) to obtain money or property by means of an untrue statement of material fact or omission of a material fact; or (3) to engage in any prac-

---

**4.** A class of underwriter defendants was conditionally *certified for the purposes of litigating* plaintiffs' § 11 claims. The class included "all underwriters who, pursuant to a single Underwriting Agreement, participated in the initial registered public offering and sale of Fortune common stock on or about March 4, 1983." *See* R.T. March 26, 1984.

**5.** In *Hudson v. Capital Management International, Inc.,* [1982–1983 Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,222 at 95,901 (N.D.Cal.1982), the court initially denied a motion to dismiss claims made pursuant to § 17(a). Recognizing that a

trial of both §§ 17(a) and 10(b) claims eliminated the need to pursue the § 10(b) claim with its requirement of scienter, Judge Patel certified the order for immediate appeal under 28 U.S.C. § 1292(b). The Ninth Circuit denied defendants' petition for permission to appeal, and Judge Patel in a subsequent decision dismissed the § 17(a) claim, deciding that the "analysis of legislative intent mandated by the Supreme Court compels the conclusion that there is no private right of action under § 17(a)." *Hudson v. Capital Management International, Inc.,* 565 F.Supp. 615, 626 (N.D.Cal.1983).

tice that operates or would operate as a fraud or deceit on the purchaser. The section does not, however, specify a remedy, although §§ 20 and 24 empower the Securities and Exchange Commission (the "SEC") to sue for injunctive relief and to prosecute violators via criminal proceedings. *See* 15 U.S.C. §§ 77t, 77x. Whether an investor may bring a civil damages suit under the section, analogous to the well-accepted private right of action under § 10(b) of the 1934 Act, has been explicitly left open by the Supreme Court. *(Aaron v. SEC, supra,* 446 U.S. at 689, 100 S.Ct. at 1951).

The Supreme Court formerly took an expansive view of the availability of private causes of action under federal statutes, reasoning that when Congress has legislated against some activity, the courts should "be alert to provide such remedies as are necessary to make effective the congressional purpose." *J.I. Case v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). In the two decades since that decision, the Court has been repeatedly called on to imply private rights of action into federal statutes that provide none, and has adopted a more analytic and restrictive approach to the issue. *See generally Touche Ross,* 442 U.S. at 578, 99 S.Ct. at 2490 ("in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today").

In *Cort, supra,* the Court considered whether a private right of action could be implied under 18 U.S.C. § 610, a criminal statute prohibiting corporations from contributing to certain political campaigns. Four factors were identified as "relevant" to the determination of whether a private right of action is implicit in a statute: (1) does the statute create a federal right in plaintiff's favor; (2) does the legislative history of the statute indicate that Congress explicitly or implicitly intended to

create such a remedy; (3) is such a remedy consistent with the underlying purposes of the legislative scheme; and (4) is the cause of action one traditionally relegated to state law, such that it would be "inappropriate" to create such an action as a matter of federal law. *Cort, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. After analyzing 18 U.S.C. § 610 under these factors, the Court held that no private remedy had been intended by Congress when it enacted the statute.[6]

■ Subsequent cases have explored how these factors should be applied, particularly in the context of the federal securities laws. The Supreme Court was asked to imply a private damages remedy for violations of § 17(a) of the 1934 Act in *Touche Ross, supra.* There, the Court noted that in *Cort* it "did not decide that each of [the four] factors is entitled to equal weight. *The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action."* 442 U.S. at 575, 99 S.Ct. at 2489 (emphasis added). The fact that a federal statute has been violated and a person harmed does not of necessity create a federal cause of action in the injured's favor. *Id.* citing *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979); *see also Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (mere fact that statute protects the interests of an identifiable group does not mean that it also implicitly creates a private cause of action in that group, *id.* at 24, 100 S.Ct. at 249). The application of these factors in *Transamerica Mortgage* well illustrates the Supreme Court's methodology.

The *Transamerica Mortgage* Court considered whether a client could sue his investment adviser for violating §§ 206 and 215 of the Investment Advisers Act of 1940

---

**6.** The issue in *Court* was whether a shareholder might sue a corporation for violation of 18 U.S.C. § 610, a criminal statute prohibiting corporations from contributing to certain political campaigns. The Court found that the statute was not designed to protect plaintiff from any harm or to govern the relationship between plaintiff and his corporation. No private right of action was found.

(15 U.S.C. § 80b–1 *et seq.*). Section 206 of that Act proscribes fraudulent conduct with a client (15 U.S.C. § 80b–6), and § 215 provides that contracts made in violation of the Act are void. 15 U.S.C. § 80b–15. The Court agreed with the plaintiff that these sections established a "federal fiduciary standard" governing the conduct of investment advisers and was intended to benefit the advisers' clients. *Transamerica Mortgage, supra,* 444 U.S. at 17, 100 S.Ct. at 246. The Act and its legislative history, however, shed no light on the subject of private rights of action. The Court then proceeded to analyze the two sections separately. As to § 215, which voids fraudulent contracts, the Court observed that there must of necessity be a forum to litigate the voidness issue; therefore, the section implicitly created a private right of action for rescission, injunction, or restitution. *Id.* at 19, 100 S.Ct. at 247.

Section 206, proscribing the employment of "any device, scheme or artifice to defraud," was a different matter. The Court observed that "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Id.* Congress had provided several means of enforcing § 206, including § 217 (criminal prosecution for violating § 206), § 209 (SEC compliance action), and § 203 (SEC administrative sanctions). From these remedies, the Court drew the inference that no private remedy had been intended for violations of § 206: "In view of these express provisions, it is highly improbable that 'Congress absent-mindedly forgot to mention an intended private action.' " *Transamerica Mortgage, supra,* 444 U.S. at 20, 100 S.Ct. at 247, quoting *Cannon, supra,* 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J. dissenting). *Accord Touche Ross, supra,* 442 U.S. at 574, 99 S.Ct. at 2488 (where Congress has provided

an explicit remedy, the Court is reluctant to imply a "significantly broader" remedy).

## B

■ Whether a private remedy for violation of § 17(a) of the 1933 Act can be implied requires the Court first to consider the language of the statute, *Transamerica Mortgage, supra,* 444 U.S. at 16, 100 S.Ct. at 245, *Touche Ross, supra,* 442 U.S. at 568, 99 S.Ct. at 2485. Section 17(a) provides:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

15 U.S.C. § 77q(a) (1976).[7] This language does not explicitly confer a private remedy, although it certainly does create a federal right in plaintiff's favor, *see Cort, supra,* 422 U.S. at 78, 95 S.Ct. at 2088. While the statute meets the first *Cort* factor, the existence of that right does not of itself imply that a remedy is available as well. *Touche Ross, supra,* 442 U.S. at 575, 99 S.Ct. at 2489.

The legislative history of the 1933 Act, the second factor to be examined under *Cort,* contains no explicit statement of Con-

---

**7.** The SEC substantially incorporated the language of § 17(a) into Rule 10b–5. As the Fifth Circuit has recently observed, *Landry v. All American Assurance Co.,* 688 F.2d 381, 387 (5th Cir.1982), § 17(a) was for a time not much used because cases that might have fit under it were instead decided under Rule 10b–5. The Su-

preme Court's limitation on such suits by requiring proof of scienter, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), caused plaintiffs to consider a § 17(a) claim as an easier case to make. *See* discussion of *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) *infra.*

gress' intent to confer or not to confer a private remedy under § 17(a). Some evidence is available, though, by way of negative inference. The House Report on the Act discusses private remedies for its violation in a section entitled "Civil Liabilities." This analysis, however, covers only §§ 11 and 12 of the Act and does not mention § 17(a). *See* H.R. 85, 73d Cong., 1st Sess., 9–10, *reprinted in* 1 Federal Bar Association Securities Law Committee, Federal Securities Laws Legislative History 1933–1982, at 146–47. *See also* Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 181–82 (1933) ("Section 17 probably does not enlarge civil remedies of purchasers. This seems clear by negative implication, because Sections 11 and 12 expressly state the remedies that are available."). 3 L. Loss, Securities Regulation at 1784 (2d ed. 1961); *Landry v. All American Assurance Co.*, 688 F.2d 381, 389–90 (5th Cir.1982).

Further circumstantial evidence that Congress did not intend to confer a private remedy under § 17(a) follows from analysis of the Act's explicit remedies. Professor Loss, considering this issue in his treatise on securities regulation, contrasts the implied remedy for violations of § 10(b) and Rule 10b–5 of the 1934 Act with § 17(a). 3 L. Loss, *supra*, at 1785. The 1934 Act prohibits a broad range of conduct, but includes only three narrow civil remedies, §§ 9(e), 16(b), and 18.[8] The 1933 Act, by contrast, contains just two substantive provisions, §§ 5 and 17. Section 12(1) of the Act provides a private action against violators of § 5, which requires the registration of certain securities. Faulty compliance

with the registration requirements of § 5 is actionable by private litigants under § 11.[9] Acts prohibited by § 17(a) are the basis for civil suits pursuant to § 12(2)[10] if the defendant is a "seller" within the meaning of that statute. Further, the SEC has broad enforcement powers under the 1933 Act. Sections 20 and 24 enable the SEC to seek injunctive relief or to pursue criminal prosecutions for violations of the Act.

Thus, because the 1934 Act establishes a broad range of protections, but few explicit remedies, Professor Loss concludes that it was reasonable for the courts to find that Congress intended further remedies for private litigants. Under the 1933 Act, however, a remedy is explicitly provided for every substantive protection conferred. These remedies are subject to substantial procedural limitations, it is true, but as Professor Loss points out:

"[T]he very restrictions contained in those sections [11 and 12] and the differences between them—for example the fact that § 11 but not § 12 imposes liability on certain persons connected with the issuer without regard to their participation in the offering * * * make[s] it seem the less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a)."

3 L. Loss, *supra*, at 1785 (2d ed. 1961).

Under similar circumstances, the *Transamerica Mortgage* Court refused to imply a private right of action under § 206 of the Investment Advisers Act, which is very similar to § 17(a), and for which SEC enforcement is explicitly provided. The Court reasoned that where Congress has

---

**8.** Section 9(e) of the 1934 Act, 15 U.S.C. § 78i(e), provides for civil liability of persons who willfully participate in actions that have the effect of manipulating stock prices.

Section 16(b), 15 U.S.C. § 78p(b), allows shareholders of an issuer to bring derivative actions on the issuer's behalf against directors, officers, and principal shareholders who realize any profit on the purchase and sale within six months of the issuer's securities.

Finally, § 18 of the 1934 Act, 15 U.S.C. § 78r, provides that any person who makes a misleading statement in any report or document required by the 1934 Act is liable to any person

who in reliance on the statement bought or sold a security the price of which was affected by that statement.

**9.** Section 11 of the 1933 Act, 15 U.S.C. § 77k(a), provides that if a registration statement contains a material misstatement or omission, a buyer may sue the issuer, signers of the registration statement, directors and partners of the issuer, experts who have been named in the registration statements, and underwriters.

**10.** *See* note 16, *infra*.

enacted express remedies, "it is highly improbable that '[it] absentmindedly forgot to mention an intended private action'." 444 U.S. at 20, 100 S.Ct. at 247, quoting *Cannon, supra*, 441 U.S. at 742, 99 S.Ct. at 1981. Thus, the second *Cort* factor is not satisfied, because neither the words of the statute nor its legislative history suggest that Congress intended to provide a private remedy.

The Supreme Court has held that the *Cort* analysis need go no further once it has been determined that a statute by its own terms grants no private remedy and that the legislative history indicates no contrary intent. At that point "[t]he question whether Congress, either expressly or by implication, intended to create a private right of action 'has been definitely answered in the negative." *Touche Ross, supra*, 442 U.S. at 576, 99 S.Ct. at 2489; *accord Transamerica Mortgage, supra*, 444 U.S. at 24, 100 S.Ct. at 249. It is enough to say, then, that § 17(a) carries with it no private cause of action because it provides none explicitly and because its legislative history is silent on the question. Analysis of § 17(a) under the third prong of *Cort*, however, illustrates even more vividly why a private remedy should not be implied.

The third step of the *Cort* inquiry examines the effect of an implied private remedy on the legislative scheme of the statute. In a recent decision, the Supreme Court held that the SEC need not prove scienter in a § 17(a)(2) or (a)(3) enforcement action, *Aaron, supra*.[11] If, after *Aaron*, a private suit were allowed under those sections, the design of both the 1933 and 1934 Acts would be seriously undermined.

In *Aaron* the Court was asked whether the SEC must prove scienter in a § 17(a) suit. Examining each subsection of the statute separately, the court found that the "language of § 17(a)(1), which makes it unlawful 'to employ any device, scheme, or artifice to defraud,' plainly evinces an intent on the part of Congress to proscribe only knowing or intentional misconduct." *Aaron, supra*, 446 U.S. at 696, 100 S.Ct. at 1955. Such an intent was *not* found under §§ 17(a)(2) or (a)(3), and the Court held that the SEC need not prove scienter in an action brought pursuant to those subsections.

Although *Aaron* concerned an SEC suit under § 17(a), nothing in the analysis suggests that the result turned on the SEC being the plaintiff in the action. The Court depended only on the language of the statute and on its history to reach this conclusion.[12]

If a § 17(a)(2) or (3) claim by a private litigant were allowed, incongruous results would follow. A plaintiff claiming that a seller had omitted a material fact from the offering documents could avoid the burden of proving scienter in a § 10(b) action [13] simply by pleading § 17 instead, entirely undercutting the legislative scheme of the two securities statutes. *See generally Landry, supra*, 688 F.2d at 385–86; *Hudson v. Capital Management International, Inc.*, 565 F.Supp. 615, 627 (N.D.Cal. 1983) (trial court refused to "embark on a trial [of a § 17(a) claim] based on a negligence standard which would annihilate the careful limits of § 10(b) of the 1934 Act and §§ 11 and 12 of the 1933 Act, contrary to Congress' intent.")

---

**11.** Plaintiffs specifically alleged violations of §§ 17(a)(2) and (a)(3). *See* consolidated amended complaint, filed October 6, 1983, at 23.

**12.** To determine whether scienter was required, the *Aaron* Court again turned to the lesson of *Touche Ross* that general reference to a statute's remedial purpose is not ground for reading the statute more broadly than its language or statutory scheme reasonably permit. "Thus, if the language of a provision of the securities laws is sufficiently clear in its context and not at odds with the legislative history, it is unnecessary 'to examine the additional considerations of "policy" * * * that may have influenced the lawmakers in their formulation of the statute.' *Ernst & Ernst v. Hochfelder*, 425 U.S. at 214 n. 33 [96 S.Ct. at 1391 n. 33]." *Aaron, supra* n. 7, 446 U.S. at 695, n. 7, 100 S.Ct. at 1955. This comment suggests that if the Court were to consider the remedies under § 17(a) issue, it would decline to read more into the statute than its language and history contain.

**13.** *See Ernst & Ernst v. Hochfelder, supra* n. 7.

The *Aaron* holding points to a key defect in the Ninth Circuit's reliance in *Stephenson* on Judge Friendly's concurrence in *Texas Gulf Sulphur*. First, the circuit did not fully quote Judge Friendly's remarks, which include a crucial proviso:

> "Once it had been established, however, that an aggrieved buyer has a private action under § 10(b) of the 1934 Act, there seemed little practical point in denying the existence of such an action under § 17—*with the important provision that fraud, as distinct from mere negligence, must be alleged.* [Citations omitted.] To go further than this, as Professor Loss powerfully argues, Securities Regulation at 1785, would totally undermine the carefully framed limitations imposed on the buyer's right to recover granted by § 12(2) of the 1933 Act."

401 F.2d at 867–68 (emphasis added). Judge Friendly acknowledged that allowing a private § 17(a) claim without a scienter requirement would be contrary to the design of the explicit remedies of the 1933 Act and the implicit remedies of the 1934 Act. The *Aaron* decision thus removes the central premise of Judge Friendly's remarks by allowing the § 17(a)(2) and (a)(3) actions to proceed without proof of scienter.[14] The Ninth Circuit apparently did not reexamine the validity of *Texas Gulf Sulphur* when it found the reasoning of that case "persuasive" on the existence of a

private damages action under § 17(a). *See Landry, supra,* 688 F.2d at 385–87; *Hudson, supra,* 565 F.Supp. at 626.

The *Stephenson* court's perfunctory conclusion that § 17(a) carries with it a private cause of action flies in the face of the Supreme Court's recent, repeated mandate that a private remedy will not be implied unless the statute or its history strongly indicate that Congress intended that such an action would lie.[15] In light of the Supreme Court's unequivocal statements on how a private remedy may be implied, and the Ninth Circuit's failure to consider this authority in *Stephenson,* this Court holds that plaintiffs may not state a claim for relief pursuant to § 17(a) of the 1933 Act.

III

The Court now turns to the question of whether plaintiffs adequately pleaded a claim for relief under § 12(2) of the 1933 Act. For the reasons set forth below, the Court finds that they have not.

Section 12(2) establishes the civil liability of any person who sells a security by means of a prospectus containing material misrepresentations or omissions; the statute provides that such a person shall be liable "to the person purchasing such security from him" for rescission or, if the plaintiff has sold the security, for damages.[16] The issue raised by defendants'

---

**14.** When Judge Friendly assumed that there was little "practical point" in denying the § 17(a) private action once the implied remedy under § 10(b) was allowed, the Supreme Court had recently adopted a liberal attitude toward the implication of private remedies. *J.I. Case v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), was decided just four years before *Texas Gulf Sulphur.* The Supreme Court's view of statutory interpretation has changed dramatically since that time.

**15.** None of the circuits that have found a private right of action under § 17(a) have applied the *Cort* or *Touche Ross* factors. *See Kirshner v. United States,* 603 F.2d 234, 241 (2d Cir.1978); *Daniel v. International Brotherhood of International Teamsters,* 561 F.2d 1223, 1245 (7th Cir. 1977); *Newman v. Prior,* 518 F.2d 97 (4th Cir. 1978). Each of these cases was decided before the clear pronouncement in *Touche Ross* and

*Transamerica Mortgage* on how a private remedy should be implied under the federal securities laws, and before the *Aaron* decision illustrated the practical difficulties in allowing such a claim. By contrast, those courts that have applied the analysis of legislative intent mandated by *Cort* have ruled against a private right of action. *Landry, supra* n. 7, 688 F.2d at 389–94; *Hudson, supra* n. 5, 565 F.Supp. at 627; *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 551 F.Supp. 580 (S.D.Ohio 1982); *Keys v. Wolfe,* 540 F.Supp. 1054, 1060 (N.D.Tex.1982); *Hill v. Der,* 521 F.Supp. 1370 (D.Del.1981).

**16.** Section 12(2) of the 1933 Act, 15 U.S.C. § 77l, provides:

> "Any person who—
>    \*    \*    \*    \*    \*    \*
>   (2) offers or sells a security \* \* \* by the use of any means or instruments of transportation or communication in interstate com-

motion to dismiss is whether plaintiffs have adequately alleged that defendants are "sellers" within the meaning of § 12(2).

■ The Ninth Circuit and others have held that § 12(2) does not require strict privity between buyer and seller, despite the seemingly explicit language of the statute.[17] Instead, "substantial participants" in the sale of the security to the plaintiff can also be held liable under the statute. Thus, a § 12(2) claim can be stated if defendants are in strict privity with plaintiffs, or if defendants were substantial participants in the sale to plaintiffs.

### A

Count II of the second amended complaint states two alternative theories of § 12(2) liability: direct privity and substantial participation. Plaintiffs' theory of direct privity is novel:

"By means of the subject registration statement and prospectus, Fortune Systems and the selling shareholder defendants were able to, and did, sell their shares of Fortune Systems common stock *directly* to the investing public, including plaintiffs Frank, Miller, and Weiss, and members of the plaintiff class, by and through the co-lead underwriters and the members of the [proposed] defendant underwriter class, *who were the selling agents* of the company and the selling shareholder defendants * * *."

Second amended consolidated complaint ¶ 50 (emphasis added). Plaintiffs thus cast the underwriters in the role of agents of Fortune Systems and the selling shareholders, with the result that Fortune Systems and the shareholders appear to be in direct privity with the buying public.[18]

■ The complaint itself, however, undercuts any factual basis for this agency theory. The Court on a motion to dismiss must accept as true all well-pleaded facts in the complaint. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The statement in paragraph 50 of the complaint that Fortune Systems sold directly to the public because the underwriters acted as its agents is not an allegation of fact; it is a legal conclusion. The Court is not required to accept legal conclusions, particularly if "the legal effect of the events plaintiff has set out in these allegations do not reasonably flow from his description of what happened, or if these allegations are contradicted by the description itself." 5 Wright & Miller § 1357 at 597; *see, e.g., Olpin v. Ideal National Insurance Co.,* 419 F.2d 1250 (10th Cir.) *cert. denied,* 397 U.S. 1074, 90 S.Ct. 1522, 25 L.Ed.2d 809 (1969) (court need not accept as true legal conclusions or factual allegations at variance with the express terms of an instrument attached to the complaint as an exhibit).

■ As evidenced by the Underwriting Agreement, which is annexed as exhibit A to the second amended consolidated complaint, the Fortune Systems common stock offering was by means of a "firm commitment" underwriting. In a firm commitment underwriting, the corporation and

---

merce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security or for damages if he no longer owns the security."

**17.** *See, e.g., Admiralty Fund v. Jones,* 677 F.2d 1289 (9th Cir.1982); *Lawler v. Gilliam,* 569 F.2d 1283 (4th Cir.1978); *Hill York Corp. v. American International Franchises Inc.,* 448 F.2d 680 (5th Cir.1971).

**18.** Plaintiffs allege that the underwriters were "necessary participants" in the sale to the public because they provided the marketing network required to complete the sale of Fortune Systems stock to the public.

selling shareholders sell the shares, eventually to be offered to the public, directly to the underwriting syndicate. The underwriters, in turn, sell to the public or to brokers and dealers. The risk that the shares will not sell or that a loss will be sustained is borne by the underwriters, not by the corporation, except to the extent that the corporation indemnifies the underwriters. *See* 1 L. Loss, *supra*, 163–64 (2d ed. 1961).

■ The Court, therefore, rejects the agency theory pleaded in paragraph 50 of the complaint because it is directly contradicted by the Underwriting Agreement.[19] Fortune Systems and the selling shareholders sold to the underwriters,[20] not to the public, and they are not in direct privity with plaintiffs.

## B

■ In the alternative, plaintiffs allege that defendants were "substantial participants" in the sale of Fortune Systems

stock to them, because (1) defendants participated in drafting the registration statement and prospectus; (2) the directors and defendant Thomas signed the registration statement; and (3) the corporation and selling shareholders made to the underwriters "representations, covenants, warrantees and agreements" in the Underwriting Agreement that facilitated the offering. Second amended consolidated complaint ¶ 51.

Before testing the adequacy of these allegations, the scope of "substantial participation" must be determined.[21] The Fifth Circuit, which is largely credited with the development of the "substantial participation" test, viewed the expansion not as a move away from the statute's literal language, but as a definition of the term "seller." *See Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692 (5th Cir.1971). The *Hill York* court

"adopt[ed] a test which we believe states a rational and workable standard for the

---

**19.** The Third Circuit has held that when stock is offered subject to a firm commitment underwriting, the defendants who sold to the underwriters are not § 12(2) sellers, unless those defendants controlled the underwriters. *Collins v. Signetics Corp.*, 605 F.2d 110, 113 (3d Cir.1979). *Accord McFarland v. Memorex Corp.*, 493 F.Supp. 631 (N.D.Cal.1980). Even were plaintiffs' theory of underwriters-as agents supported by the complaint, plaintiffs have cited no cases predicating § 12(2) seller status on such a theory.

Further, plaintiffs may not premise liability under the federal securities laws on common law agency principles. The Ninth Circuit has repeatedly held that the control person provision of the 1934 Act (§ 20 which is parallel to § 15 of the 1933 Act) supplants state law agency or *respondeat superior* theories in federal securities litigation. *Christoffel v. E.F. Hutton*, 588 F.2d 665, 668 (9th Cir.1978); *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.1975). Plaintiffs cannot attempt to save their § 12(2) claims by way of the control person statute, 15 U.S.C. § 77o. To succeed on that theory plaintiffs would have to plead that the defendants "controlled" the underwriters. In *McFarland*, plaintiffs alleged that certain defendants were liable for violation of § 11 of the 1933 Act because they were control persons. Judge Ingram granted defendants' motion to dismiss, because no facts were alleged in the complaint even suggesting that the officers and directors

or selling warrant holders of Memorex controlled that corporation.

"[A] mere allegation of control that appears not to have been made in good faith is not sufficient to withstand a motion to dismiss." *McFarland, supra*, 493 F.Supp. at 649.

Plaintiffs' complaint alleges no facts at all that would suggest that the selling shareholders and/or Fortune Systems in any way "control" the underwriter defendants.

**20.** Although some members of the plaintiff class probably did purchase stock directly from some members of the underwriters syndicate, the § 12(2) claim was dismissed as it pertained to the underwriters because it was clear from the complaint that the named underwriter defendants had not sold to the named plaintiffs. The Court denied plaintiffs' motion for certification of a defendant underwriter class for the purposes of litigation the § 12(2) claim. *See* R.T., March 26, 1984, at 25–28.

**21.** Plaintiffs in the first amended complaint alleged that defendants were also liable under § 12(2) as aiders and abettors. This Court held that aider and abettor liability is not available for violations of § 12(2); the scope of secondary liability is limited to "control persons," as defined in § 15 of the 1933 Act. *See Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 640–42 (C.D.Cal.1983); *Hudson, supra* n. 5, ¶ 99,222 at 95,903.

imposition of liability * * *. Its base lies between the antiquated 'strict privity' concept and the overbroad 'participation' concept which would hold all those liable who participated in events leading up to the transaction."

*Id.* The court then held that the proper test for seller liability, stated in terms of cause and effect, is: "[D]id the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?" *Id.* at 693, *citing Lennerth v. Mendenhall,* 234 F.Supp. 59, 63 (N.D.Ohio 1964). The Ninth Circuit in *Admiralty Fund v. Jones,* 677 F.2d 1289, 1293 (9th Cir.1982) adopted the *Hill York* test.[22]

While the *Hill York* test can be simply stated, its application is less clear. For example, it could be said that any person performing a task necessary to the registration of a security has enabled its owner to sell it to the plaintiff. In that sense, plaintiff's injury flows directly from that person's involvement in the offering process. Liability in such a case, however, would be contrary to the *Hill York* court's rejection of a mere "participation" standard that "would hold all those liable who participated in the events leading up to the transaction." *Id.* at 692. Courts applying the substantial participation test have taken care not to premise liability on such a broad range of conduct, as a review of the cases illustrates.

In each of the cases the parties have cited to this Court, substantial participation has been found only where the defendant has engaged in high degree of individual effort to sell the security and usually has been in actual contact with the plaintiff. In *Hill York,* defendants engaged in a complex and unusual scheme to market franchises for a nonexistant chain of restaurants. The individual defendants were the shareholders of American International, which marketed the franchising concept. American, through its shareholders, sought out local investors to incorporate a regional franchise sales center, which in turn would market restaurant franchises to the public. Defendants persuaded three men in Florida to incorporate the "Florida Franchise." Then, using instructions, advice, and supplies given by defendants, these men sold the remaining shares in the Florida Franchise to plaintiffs. Once the Florida Franchise was incorporated, American sold to it for $25,000 the exclusive right to market more franchises, and later attempted to extract a $1,000 per month "service fee." Plaintiffs sued, alleging that the defendants were engaged in a pyramid scheme. The jury found that defendants had violated §§ 12(1) and 12(2) of the 1933 Act.[23] *See Hill York, supra,* 448 F.2d at 685.

On appeal the Fifth Circuit found that defendants' conduct was within the letter and spirit of § 12.

"The defendants were the motivating force behind this whole project. They sought out the original incorporators of the Florida Franchise and then trained them [personally] to solicit additional capital. They provided the sales brochures designed to secure this additional

---

**22.** While approving the "substantial participation" test, the *Admiralty Fund* court included a footnote casting doubt on the continued validity of this liberal approach to § 12(2) liability:

"[T]he broad reading of 'seller' may be in some doubt in light of recent Supreme Court cases that prescribe a strict statutory construction approach to the security acts and reject their expansion with tort and criminal theories."

*Admiralty Fund, supra* n. 17, 677 F.2d at 1294 n. 3. As the discussion of § 17(a) of the 1933 Act above points out, the Supreme Court has mandated that the courts read federal statutes no more broadly than their language or legislative histories permit. *See, e.g., Touche Ross & Co. v.*

*Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). It is of course impossible to predict with certainty that the Supreme Court would reject the "substantial participation" test, were it to consider the question. To date, the issue has not been before it. Because plaintiffs have not adequately pled substantial participation, however, this Court need not consider whether that test is a permissible expansion of liability under § 12 of the Act.

**23.** The definition of "seller" for purposes of §§ 12(1) and 12(2) is the same. *Hill York, supra* n. 17, 448 F.2d at 692.

capital. In fact, the defendants did everything but effectuate the actual sale."

*Id.* at 693. Although the defendants did not themselves sell shares to plaintiffs, the Court found they had direct, personal involvement with plaintiffs. This fact distinguishes *Hill York* from the case at bar where the securities were sold on the open market through the stock exchange.

The same high level of defendant involvement is found in other cases as a predicate to § 12(2) liability, demonstrating that the participation looked for is the direct involvement of the defendant in the *particular* sales transaction to the *particular* plaintiff. *See, e.g., Admiralty Fund, supra,* 677 F.2d at 1295 (defendant, the corporation's attorney, participated in all stages of negotiations with the plaintiff for purchase of certain debentures); *Junker v. Crory,* 650 F.2d 1349 (5th Cir.1981) (after holding that a merger may be a "sale" for purposes of federal securities laws, court found attorney who made representations favoring the merger at a shareholders' meeting before the shareholders voted on the merger and otherwise acted as the seller's agent, was a § 12 seller); *Lawler v. Gilliam,* 569 F.2d 1283, 1288 (4th Cir.1978) (defendants who personally solicited investments from plaintiff and shared in the enterprise's profits rather than receiving a commission, were "sellers" and not disinterested brokers for the plaintiff). *Cf. Hudson v. Capital Management International, Inc.,* [1982–1983 Binder] Fed.Sec.L. Rep. (CCH) ¶ 99,222 at 95,904 (N.D.Cal. 1982) (allegation that defendants participated in operation of the organization, offered their own opinions in the sales circulars, or directly disseminated information to investors, is not adequate pleading of § 12(2) seller status); *Deneau v. Walter,* No. C–82–3132–MHP, slip op. at 3–4 (N.D. Cal. Sept. 30, 1983) (involvement of corporate officers and directors in the preparation of offering materials is *not* substantial participation, which requires that defendant have played a substantial role in the process leading to the particular sales transaction at issue).

Plaintiffs contend that two cases support the proposition that participation in the making of a registration statement is enough for § 12(2) liability. These cases, when carefully examined, actually support defendants' position. In *SEC v. Murphy,* 626 F.2d 633 (9th Cir.1980), Murphy was the promoter and chairman of a corporation that created limited partnerships to sell cable television systems. Carefully documenting Murphy's involvement in the sales, the court found that he devised the corporation's financing scheme (which was similar to the *Hill York* pyramid, 626 F.2d at 643, 652 n. 22), prepared and reviewed offering memoranda, "met *personally with broker-dealers and investors* and their representatives; and * * * spoke at broker-dealer sales seminars." 626 F.2d at 652 (emphasis added). This level of contact is like that in *Hill York* and quite unlike that in the case before this Court.

The second case relied on by plaintiffs is similar, *Lennerth v. Mendenhall,* 234 F.Supp. 59, 61 (N.D.Ohio 1964). Although the court did not explain in detail the factual basis of the securities violations at issue, it appears that it found one defendant a § 12(2) seller because he personally met with plaintiffs at least three times, informed them of the details of the venture, and made the representations contended by plaintiffs to be false. A second defendant, vice president of the corporation, also met with plaintiffs and persuaded them to travel from Ohio to Seattle to close the deal and "approved" their participation in the venture.

Significantly, in *Lennerth* and *Murphy* the sale did *not* occur on a securities exchange. Instead the security was marketed through the personal efforts of the promoters and their close associates who sought out investors and had contact with the plaintiffs. As Judge Patel commented in *Deneau, supra,* No. C–82–3132–MHP, slip op. at 3–4:

"[Plaintiff's] allegations [that defendants created the securities, arranged for their registration and provided information to

the public] if true, would establish no more than that the defendants arranged for the issuance of new shares in the same manner as any corporation and its officers must arrange for a new issuance. Plaintiff has not, and apparently cannot, allege any personal involvement by defendants in the particular transaction in which he purchased his depository receipts. The allegations fall far short of those in [*Admiralty Fund*] where the defendant in question had been involved in the final arrangements of the stock sales and the question was the extent of his involvement. To find defendants liable for having participated in this sale would be tantamount to holding that a corporation participates for purposes of § 12(2) in every open-market transaction in its shares."

As in *Deneau* if plaintiffs' theory of § 12(2) seller status were accepted, the corporation, its officers and directors, whose efforts were all required to get the securities to market, would always be liable under § 12(2). This result illustrates that what plaintiffs really advocate is a mere "participation" test for seller status, a standard rejected in *Hill York* and all subsequent cases.

A final rationale for rejecting plaintiffs' theory that participation in the creation of the offering materials is enough to subject defendants to a § 12(2) liability may be derived from the structure of the civil liability provisions of the 1933 Act. "Sellers," assuming for the moment that that term is not ambiguous, are liable for violations of § 12, *unless* the seller can prove that he did not know, and by the exercise of reasonable care could not have known, of the misstatement. By contrast, under

§ 11 of the 1933 Act, which prohibits essentially the same conduct, the issuer is strictly liable; five other categories of defendants may also be sued under § 11 unless they can prove that after making a reasonable investigation they had reasonable grounds to believe and did believe that the statements were true. Section 11 allows a plaintiff to sue, in addition to this issuer, (1) the registration statement signers, (2) directors and partners of the issuer, (3) persons named in the registration statement as about to become officers, (4) experts who certify to facts made in the registration materials, and (5) underwriters.

Section 11, therefore, carries with it a "heavier legal liability * * * [because it] throws upon originators of securities a duty of competence as well as innocence." H.R. 85, 73d Cong. 1st Sess. at 9 *reprinted in* 1 Federal Bar Association Securities Law Committee, Federal Securities Laws Legislative History 1933–1982, at 146–47. Expansion of § 12(2) liability by broadly defining "seller" to include effectively all potential § 11 defendants would irretrievably blur the two sections together, by destroying the carefully crafted defenses and definitions of persons liable built into the respective statutes.[24]

For example, a director of the issuer under sued § 11 would have to prove that he made reasonable investigation of the facts in the prospectus and reasonably believed them to be true. If the same director were found to be a "seller" simply because he signed the registration materials, he could escape § 12 liability by proof merely that he did not know and by the exercise of reasonable care (whether or not

---

**24.** Although the Third Circuit has rejected the "substantial participation" theory, its comment on the pragmatic effect of broadly interpreting "seller" is pertinent.

"[Section 12(2) ] is designed as a vehicle for a purchaser to claim against his immediate seller. Any broader interpretation would * * * frustrate the statutory schema because Congress has also provided a specific remedy for

a purchaser to utilize against the issuer as distinguished from the seller of a security. Thus section 22 gives anyone acquiring a security a specific right of action against every person who signed the registration statement or was a director or partner of the issuer * *."

*Collins v. Signetics,* 605 F.2d 110, 113 (3d Cir. 1979).

such care was actually exercised) could not have known of the misstatement.[25]

■■■■■ Where Congress has enacted statutes specifically defining liabilities for particular acts, the courts should not in the guise of "statutory interpretation" broaden such liabilities in a way that renders meaningless the limitations and conditions that Congress has designed. *See generally Touche Ross, supra.* This Court, therefore, rejects such expansion of § 12 liability and holds that "substantial participation" cannot be premised solely on the routine activities conducted by all corporations, their officers and directors, prior to "going public." Instead, a plaintiff must plead facts showing that each defendant accused of violating the section substantially participated in the particular sale of the security to the plaintiff.

---

**25.** Another important difference between §§ 11 and 12 is the extent of underwriter liability. Under § 11 an underwriter may not be held liable for damages in excess of the total price at which the securities underwritten by him and distributed to the public, unless that underwriter knowingly received from the issuer some benefits in which the rest of the underwriting syndicate did not share. There is no similar limitation under § 12.